## IN THE CHANCERY COURT FOR THE FIRST JUDICIAL DISTRICT OF HINDS COUNTY, MISSISSIPPI

IN RE:    **FLETCHER EXPLORATION, LLC,**
**a Mississippi Limited Liability Company**

**DANIEL P. SLOAN,**
**Manager and Member**                                                    **PLAINTIFF**

**VS.**                                                    **CAUSE NO. P2016-186 W/4**

**RICKY FLETCHER a/k/a RICK FLETCHER,**
**Manager and Member**                                                    **DEFENDANT**

### FIRST AMENDED PETITION TO DISSOLVE FLETCHER EXPLORATION, LLC AND FOR OTHER RELIEF

COMES NOW Daniel P. Sloan ("**Sloan**" or "**Plaintiff**"), Manager and Member of Fletcher Exploration, LLC (the "**Company**"), and, pursuant to F.R.C.P. 15, files this *First Amended Petition to Dissolve Fletcher Exploration LLC and for Other Relief*, which amends Sloan's *Petition to Dissolve Fletcher Exploration LLC and for Other Relief*, filed on February 12, 2016 at Document No. 2 of the Court's MECF system, requesting that this Court dissolve the Company and for other relief against the Company and against Ricky Fletcher a/k/a Rick Fletcher ("**Fletcher**" or "**Defendant**") and states and pleads the following:

Sloan petitions the Court to dissolve the Company pursuant to Miss. Code Ann. § 79-29-801, *et seq.*, and for the other relief against the Company and Fletcher requested herein.

For cause, Sloan affirmatively pleads the following:

#### Parties

1.    Fletcher Exploration, LLC is a Mississippi Limited Liability Company with its principal place of business located at 25 Spring Run Drive, Fairhope, Alabama 36532, and may be served with process of this Court through its registered agent, National Registered Agents, Inc., 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

2.      The Plaintiff, Daniel P. Sloan, is an adult resident citizen of the State of Alabama, residing at 21298 Rolling Oaks Drive, Fairhope, Alabama.

3.      The Defendant, Ricky Fletcher a/k/a Rick Fletcher ("**Fletcher**"), is an adult citizen of Canada, who legally resides in the State of Alabama and is a legal resident of the United States, and has submitted himself to the laws and jurisdiction of this Country and this State through both his actions and statements, including the forming and operation of the Company, as well as the forming and operation of other business entities within the United States, including Fletcher Petroleum Corporation, an Alabama Corporation.  Fletcher may be served with process of this Court at his place of business, Fletcher Petroleum Corp., 25 Spring Run Drive, Fairhope, Alabama 36532.

## Jurisdiction and Venue

4.      The Company is a Mississippi Limited Liability Company with no principal office located in this State.  Therefore, Jurisdiction is proper in the State of Mississippi and venue is proper in the First Judicial District of Hinds County, Mississippi, pursuant to Miss. Code Ann. § 79-29-803(1) (Rev. 2013).

## General Factual Allegations

5.      The Company was formed under the laws of and in the State of Mississippi on March 2, 2011.

6.      The Company is in good administrative standing in this State, having filed its most recent annual report on January 11, 2016, a copy of which is attached hereto as **Exhibit A** incorporated herein by reference for all purposes.

7.      The Company has two members, namely Sloan and Fletcher. Other than Sloan and Fletcher, no other persons or entities are legal members of the Company.

8.      Sloan owns two hundred fifty (250) Membership Interests (the "**Interest**"), constituting twenty-five percent (25%) of the total interest in the Company.

9.      Fletcher owns seven hundred fifty (750) Membership Interests, constituting seventy five percent (75%) of the total interest in the Company.

10.     The Company has two Managers, namely Sloan and Fletcher. Other than Sloan and Fletcher, no other persons or entities are legal managers of the Company.

11.     On October 18, 2011 and in their individual capacities, Sloan and Fletcher executed an Operating Agreement (the "**Operating Agreement**"), which, together with the Revised Mississippi Limited Liability Company Act, Miss. Code Ann. § 79-29-101, *et seq.* (the "**Act**") governs the operation and the dissolution of the Company. The Operating Agreement is attached hereto as **Exhibit B** and incorporated herein by reference for all purposes.

12.     In accordance with the express terms and conditions set forth in the Operating Agreement, no Manager may be removed without the consent of an eighty-five percent (85%) super-majority vote of the Membership of the Company. As such, both Sloan and Fletcher remain as Members and Managers.

13.     Beginning in 2011, when the Company was formed, through August 2013, as a matter of practice and dealing, Sloan managed all daily operations of the Company, while Fletcher lived and worked in Canada. During this time, the Company was very profitable.

14.     After several failed attempts to manage other, unrelated companies, Fletcher became more active in the Company in August 2013 when he moved his home and office to Fairhope, Alabama, where the Company's principal office is located.

15.     During this same time period (post-August 2013), Fletcher divorced his wife and brought his girlfriend into the Company as his personal assistant.

16.     Fletcher also hired at least two other Canadians who did not contribute substantially to the Company.

17.     These and other actions that have wasted the Company's assets led to Sloan demanding a dissolution of the Company and a partition of the Company's assets in late 2015

18.     As a result, Fletcher then began to take actions that oppress Sloan as a minority interest holder, including, but not limited to:

    a.   excluding Sloan from Company decisions;

    b.   removing Sloan from the Company's offices;

    c.   refusing to pay Sloan the salary to which he is entitled;

    d.   making unfounded threats and accusations against Sloan;

    e.   slandering Sloan;

    f.   interfering with Sloan's business relations with third-parties;

    g.   refusing Sloan access to Company books and records;

    h.   breaching Sloan's privacy by reviewing his private and business emails without authorization;

    i.   withholding information from Sloan;

    j.   entering business relationships without consulting Sloan;

    k.   encumbering Sloan's Interest in the Company without authorization;

    l.   jeopardizing the Company's reputation and business interests;

    m.   failing to abide by the Operating Agreement;

    n.   convening Company meetings without proper notice to Sloan;

    o.   making business decisions which are outside of the ordinary and sound business judgment of a competent executive in the Company's industry; and

p.  taking other adverse actions which negatively affect the Company and Sloan.

## Count I:  Dissolution of the Company

19.      Sloan incorporates the allegations of all preceding paragraphs.

20.      Pursuant to Miss. Code Ann. § 79-29-803(1)(a), Sloan requests the dissolution of the Company because it is no longer reasonably practicable to carry on the business of the Company in conformity with the Certificate of Formation or the Operating Agreement.

21.      Pursuant to Miss. Code Ann. § 79-29-803(1)(b), Sloan requests the dissolution of the Company based on Fletcher's abuse of authority and oppression of Sloan as a minority Interest holder.

22.      Sloan further requests dissolution based on Fletcher's waste of the Company's property and his persistent and pervasive fraud on Sloan and the Company and its investors.

23.      Sloan further requests that the assets be distributed to the Interest holders.

## Count II:  Accounting and Valuation

24.      Sloan incorporates the allegations of all preceding paragraphs.

25.      Pursuant to Section 11.03 of the Operating Agreement, Sloan demands that an accounting of all of the Company's assets, liabilities, and operations be conducted by an independent third-party accounting firm.

26.      Sloan further requests an independent third-party valuation of all Company assets, including reserves.

## Count III:  Breach of Contract

27.      The averments set forth in the preceding Paragraphs are realleged in full and incorporated herein by reference.

28.    The Operating Agreement constitutes a valid, legal and binding contract between Fletcher and Sloan, and is complete and enforceable in accordance with its terms.

29.    No condition(s) precedent to the obligation of Fletcher to fully perform in accordance with the terms and conditions of the Operating Agreement are outstanding, and Fletcher has wholly failed and refused to perform as promised and agreed.

30.    As a result, Fletcher has breached his contractual obligations set forth in the Operating Agreement and has thereby caused damages to the Company and to Sloan.

### Count IV:  Breach of Fiduciary Duty

31.    The averments set forth in the preceding Paragraphs above are realleged in full and incorporated herein by reference.

32.    As the owner of the majority interest in the Company, any action undertaken directly by or at the behest of Fletcher must at all times be intrinsically fair to Sloan as the owner of a minority interest in the Company, and Fletcher must bear towards Sloan the same relationship of trust and confidence which prevails in partnerships. The fiduciary relationship that exists between and among Fletcher, Sloan and the Company requires that Fletcher conduct his position with prudence and all good fidelity, and to exercise the utmost good faith and loyalty in the discharge of his duties and in the pursuit of any action affecting the foregoing.

33.    Through his intentional and egregious conduct, Fletcher has breached those fiduciary duties and has caused damage to both the Company and Sloan, for which Fletcher is compelled to account.

### Count V:  Breach of Duty of Good Faith and Fair Dealing / Bad Faith

34.    Sloan incorporates the allegations of all preceding paragraphs.

35.     Fletcher's breach of his duties of good faith and fair dealing, which are inherent in all contracts, and Fletcher's Bad Faith have caused damages to both Sloan and the Company.

36.     The written Operating Agreement constitutes a valid, legal, binding and enforceable contract between Fletcher and Sloan, and like all contracts contains an implied covenant of good faith and fair dealing between and among its parties in its performance and enforcement. The intentional actions and subterfuge of Fletcher so greatly violate all fundamental notions of decency, fairness and reasonableness as to constitute a breach of his duties of good faith and fair dealing under the Operating Agreement.

### Count VI:  Intentional Oppression of Rights of Minority Interest Owner

37.     The averments set forth in all preceding Paragraphs above are realleged in full and incorporated herein by reference.

38.     By virtue of Sloan's ownership of a minority Interest in the Company, Sloan is vulnerable to the intentional, impermissible actions of Fletcher as the owner of a majority interest. These actions were performed by Fletcher with the intent to purposefully "freeze-out" and oppress the rights of Sloan, and to deny Sloan the right to exercise such rights or otherwise share in the bounty of the Company. Sloan's status as the owner of a minority Interest creates a legal duty in Fletcher to at no time engage in such actions; nonetheless, Fletcher willfully and intentionally breached this duty owed to Sloan, which has proximately caused direct injury to Plaintiff.

### Count VII:  Conversion and Civil Theft

39.     The averments set forth in all preceding Paragraphs above are realleged in full and incorporated herein by reference.

40.     The actions of Fletcher concerning the assets and interests of Sloan constitute an exercise of dominion and control over such assets and interests that are in exclusion and defiance

of the rights possessed by Sloan. Further, these actions were intentional, wrongful, were conducted without the permission of Sloan, and continued despite Sloan's resistance and protest, thus constituting a conversion and civil theft of the property of Sloan.

41.     Fletcher's conversion and civil theft of Sloan's property has proximately caused actual damage to Sloan, for which Sloan is entitled to recover.

### Count VIII:  Appointment of a Receiver

42.     The averments set forth in all preceding Paragraphs above are realleged in full and incorporated herein by reference.

43.     Contrary to the continuing protest and objections of Sloan, Fletcher has used his position as the owner of a majority interest in the Company to engage in actions that have resulted in the ongoing and continued wasting of Company assets, to the detriment of both the Company and the rights of Sloan. These deliberate actions so greatly violate every reasonable notion of sound business judgment as to constitute a degree of gross mismanagement that places in eminent peril the rights of Sloan as the owner of a minority interest in the Company.

44.     Furthermore, the ongoing dispute between Sloan and Fletcher concerning these actions has proven irresolvable, and accordingly Sloan requests that this Court appoint a receiver pursuant to Miss. Code Ann. § 79-29-803(3) (2013) to wind-up the Company's affairs and to distribute the assets of the Company to Sloan and Fletcher.

### Count IX:  Partition

45.     The averments set forth in all preceding Paragraphs above are realleged in full and incorporated herein by reference.

46.     Based on the speculative nature of the Company's assets and the difficulty in valuing oil and gas production and reserves, Sloan requests a partition in kind of all assets.

47.     A court-appointed receiver or special master may evaluate the Company's assets and make a recommendation to this Court regarding the partition in kind of the Company's assets and Sloan requests that the Court appoint such a receiver or special master.

48.     Alternatively, Sloan requests a partition by sale of all assets.

### Count X:  Quantum Meruit and Unjust Enrichment

49.     The averments set forth in all preceding Paragraphs above are realleged in full and incorporated herein by reference.

50.     Sloan has invested a significant amount of his time over the past five years and has not been provided adequate compensation through salary, dividends, distributions, and compensation.

51.     Fletcher has wasted the assets of the Company, including paying friends, girlfriends, and other non-essential insiders exorbitant and unnecessary salaries.

52.     Fletcher has been unfairly and unjustly enriched by Sloan's labor, expertise, investment, services, and other efforts and contributions.

53.     Sloan's contributions were provided at the request and with the knowledge, approval, and consent of Fletcher, and at all times, were done so with the expectation by Sloan of just and fair compensation and not as a gratuity.

54.     Sloan is entitled to the fair value for all of his contribution to the Company and to Fletcher.

55.     Sloan demands from Fletcher the quantum meruit of Sloan's contributions.

### Count XI:  Preliminary and Permanent Injunction

56.     The averments set forth in all preceding Paragraphs above are realleged in full and incorporated herein by reference.

57.     Fletcher has engaged in and continues to engage in conduct that has been and continues to be injurious to both Sloan and the Company. These injuries constitute harm that is irreparable, as they concern among other matters the wasting, transferring, disposing and/or encumbering of Company assets, as well as the overall devaluation of the Company and as a consequence Sloan's ownership interest therein.

58.     In order to preserve the status quo and prevent further irreparable harm, Sloan requests that Fletcher be preliminarily and permanently enjoined from taking any action for or on behalf of the Company that constitute an act or acts of dominion, influence or control, whether through sale, assignment, transfer, disposal, encumbrance or otherwise, over the assets or other property of the Company, including without limitation the Company's name, bank accounts, accounts receivable, facilities, equipment, contracts, leases or other agreements of any nature, of particularly any action which encumbers or disposes of any Company assets.

### Count XII:  Punitive Damages

49.     The averments set forth in all preceding Paragraphs above are realleged in full and incorporated herein by reference.

50.     The actions of Fletcher were done knowingly, willfully and intentionally, with insult, abuse and reckless disregard for the rights of Sloan as the owner of a minority interest in the Company.

51.     The bad faith evidenced by Fletcher's intentional breach of the fiduciary duties owed to Sloan and the Company are so extreme as to constitute and independent tort, thereby entitling Sloan to punitive damages. In addition to all other relief sought herein or to which Sloan may otherwise be entitled, Sloan is further entitled to receive punitive damages in an amount to be

determined by this Court to punish Fletcher for his actions and to deter such further conduct in the future.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff Daniel P. Sloan prays that summons issue against Defendant Ricky Fletcher a/k/a Rick Fletcher in accordance with law, that the Defendant be cited to appear and answer herein, and on final hearing hereof that this honorable Court grant the following relief:

a. An order for the dissolution of the Company and distribution of its assets to the owners thereof;

b. An order requiring that accounting and valuation of the Company's assets and liabilities be conducted;

c. A judgment in favor of Plaintiff and against the Defendant for actual, compensatory, consequential, and punitive damages, together with post-judgment interest thereon at the legal rate until paid in full, for breach of contract; breach of fiduciary duty; breach of duty of good faith and fair dealing; intentional oppression of the rights of Plaintiff as a minority interest owner; conversion and civil theft; and quantum meruit and unjust enrichment of the Defendant;

d. A judgment in favor of Plaintiff and against the Defendant for all costs of this action, including reasonable attorney fees and costs of court;

e. An order appointing a Receiver to manage and wind-up the Company's operations;

f. An order partitioning the Company's assets, either in kind or by sale; and

g. An injunction prohibiting Fletcher from taking any further action on behalf of the Company.

Plaintiff prays for such other relief, general or specific, to which the Plaintiff may be justly entitled in the premises.

RESPECTFULLY SUBMITTED, this the 25th day of February, 2016.

DANIEL P. SLOAN, Plaintiff

By:      s/John D. Moore
JOHN D. MOORE, MSB No. 10610

John D. Moore, MSB No. 10610
Melanie T. Vardaman, MSB No. 100392
Law Offices of John D. Moore, P.A.
301 Highland Park Cove, Suite B (39157)
Post Office Box 3344
Ridgeland, MS 39158-3344
601-853-9131
john@johndmoorepa.com
Attorneys for Daniel P. Sloan

**F0108**

**2016006834**

Fee: $



Business ID: 979454
Filed: 01/11/2016 03:31 PM
C. Delbert Hosemann, Jr.
Secretary of State

DELBERT HOSEMANN
*Secretary of State*

P.O. BOX 136
JACKSON, MS 39205-0136

TELEPHONE: (601) 359-1633

## 2016  LLC Annual Report

## Business Information

*Business ID:* 979454

*State of Incorporation:* MS

*Phone:* (***)***-****

*FEIN:* **-*******

*Business Name:* Fletcher Exploration LLC

*Business Email:* dan@fletcherpetroleum.com

*Principal Address:*  101 LOTTIE LANE, UNIT #5
FAIRHOPE, AL 36532

## Registered Agent

*Name:*  NATIONAL REGISTERED AGENTS INC

*Address:*  645 Lakeland East Drive, Suite 101
Flowood, MS 39232

## Managers and Members

## Managers

| *Name:* | *Address:* |
|---|---|
| Daniel P Sloan *Manager* | P.O. BOX 2147 FAIRHOPE, AL 365332147 |
| Ricky Fletcher *Manager* | P.O. BOX 2147 FAIRHOPE, AL 365332147 |



**Officers**

| Title/Name: | Address: | Director: |
|---|---|---|
| **President:** | | ☐ |
| **Vice President:** | | ☐ |
| **Secretary:** | | ☐ |
| **Treasurer:** | | ☐ |

☑ This LLC has a written Operating Agreement.

## NAICS Code/Nature of Business

211111 - Crude Petroleum and Natural Gas Extraction

## Signature

By entering my name in the space provided, I certify that I am authorized to file this document on behalf of this entity, have examined the document and, to the best of my knowledge and belief, it is true, correct and complete as of this day *01/11/2016*.

| *Name:* | *Address:* |
|---|---|
| Daniel P Sloan | P.O. Box 2147 |
| *Manager* | Fairhope, AL 36533 |

**Officers List**

*Name:*

Daniel P Sloan
*Manager*

Ricky Fletcher
*Manager*

*Address:*

P.O. BOX 2147
FAIRHOPE, AL 365332147

P.O. BOX 2147
FAIRHOPE, AL 365332147

# OPERATING AGREEMENT
# FOR
# FLETCHER EXPLORATION, LLC

THIS OPERATING AGREEMENT is made and entered into as of the 1st day of January, 2011 by Rick Fletcher and Daniel P. Sloan, as admitted Members of the Mississippi Limited Liability Company of **FLETCHER EXPLORATION, LLC** (collectively referred to as the "Members" and individually as a "Member") and certify as follows:

## ARTICLE I: DEFINITIONS

**1.01. *Definitions*.** The following terms used in this Operating Agreement shall have the following meanings (unless otherwise expressly provided herein):

    a. *"Adequate Cause."* "Adequate Cause" for termination of a Member's status as an Employee-Member is limited to conviction of or a plea of guilty or nolo contendere to a felony or a misdemeanor involving dishonesty, any other criminal conduct against Company, a continued breach of the Employee-Member's duties and obligations arising under an employment contract with Company or of any written policy, rule, or regulation of Company, for a period of at least five (5) days following his or her receipt of written notice from any officer of Company specifying such breach.

    b. *"Agreement"* The "Agreement" is this Operating Agreement, as amended from time to time and all schedules, as they may be amended from time to time.

    c. *"Agreement Price"* The "Agreement Price" is the price at which, pursuant to the terms of this Agreement, a Member must offer to sell all or any of his or her Membership Interest.

    d. *"Agreement Terms"* The "Agreement Terms" are the terms and conditions under which the sale of a Member's Membership Interest is conducted, including (but not limited to) the form of consideration to be paid, the time of the closing, and the steps to be taken at the closing.

    e. *"Articles of Organization"* shall mean the Articles of Organization of **FLETCHER EXPLORATION, LLC**, as filed with the Secretary of State of Mississippi as the same may be amended from time to time.

    f. *"Assignee"* shall mean a person to whom a Membership Interest is transferred but who is not accepted as a Member pursuant to Article X.

    g. *"Code"* The "Code" is the Internal Revenue Code of 1986, as amended.

    h. *"Company"* shall refer to **FLETCHER EXPLORATION, LLC**, a Mississippi Limited Liability Company.

    i. *"Days"* Any reference in this Agreement to "days" means all calendar days, whether or not such days are legal holidays under the laws of the United States or any State.

1



iii. Such Reserves as the Managers deem reasonably necessary to the proper operation of the Company's business.

l. *"Economic Rights"* shall mean an Assignee's rights to receive Distributions and a return of capital upon liquidation and dissolution.

m. *"Effective Date"* shall mean the date of execution of this Operating agreement by the last of the Members to sign it.

n. *"Employee-Member"*. An "Employee-Member" is a Member who is also a Managing Member, Officer, Employee, or Director (or some combination thereof) of Company.

o. *"Encumber" or "Encumbrance."* "To Encumber" includes to pledge, hypothecate, or otherwise secure any type of debt or obligation with Membership Interest, whether incurred voluntarily or involuntarily, and in any manner whatsoever. An "Encumbrance" is any type of security or surety interest created by such Encumbering.

p. *"Entity"* shall mean any corporation, limited liability company, partnership, limited partnership or other entity.

q. *"Mississippi Act"* shall mean the Mississippi Revised Limited Liability Company Act, M. S. Chapter 79-29, et seq.

r. *"Fiscal Year"* shall mean the Company's fiscal year, which shall be the calendar year.

s. *"IRC"* shall mean the Internal Revenue Code of 1986 or corresponding provisions of subsequent superseding federal revenue laws.

t. *"Gifting Member"* shall mean any Member who gifts, bequeaths, or otherwise transfers for no consideration (by operation of law or otherwise, except for bankruptcy) all or any part of its Membership Interest.

u. *"LLC"* The "LLC" is **FLETCHER EXPLORATION, LLC,** a Mississippi Limited Liability Company.

v. *"Majority Vote"* shall mean the vote of Members holding more than fifty percent (50%) of the issued and outstanding Membership Interest.

w. *"Manager"* shall mean one or more managers. Specifically, *"Manager"* shall mean Rick Fletcher and Daniel P. Sloan or any other persons that succeed one of the above named people in that capacity. References to the Manager in the singular or as him, her, it, itself, or other like references shall also, when the context so requires, be deemed to include the plural or the masculine or feminine reference, as the case may be.

x. *"Members"* shall mean those person listed in Article IV.

y. *"Membership Interest"* shall refer to the Member's percentage ownership of the Company and is computed by dividing the number of Membership Units owned by a Member by

3

the total number of issued and outstanding Membership Units. The term *"Membership Interest"* shall also refer to a Member's entire interest in the Company including the Member's (i) rights to receive allocations of Profits and Losses, Distributions, and a return of capital, and (ii) the right to participate in the management of the business and affairs of the Company, to vote on, to consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Operating Agreement and the Mississippi Act.

z.  *"Membership Units"* shall mean one or more units owned by a Member out of the 1000 authorized Membership Units, as designated on *Exhibit A* attached hereto (as it may be amended from time to time) and set forth opposite the Members' names. Each Membership Unit represents a percentage ownership in the LLC. Such percentage is sometimes herein referred to as a Member's "Membership Interest" and it is computed by dividing the number of Membership Units owned by a Member by the total number of issued and outstanding Membership Units. Holders of Membership Units shall be entitled to vote on all matters on which Members may vote or consent in this Operating Agreement or under the Mississippi Act.

aa.  *"Offered Membership Interest."*  The "Offered Membership Interest" is all of the Membership Interests which are offered for sale to the other Members or to the LLC, or which are deemed to have been so offered pursuant to this Agreement.

bb.  *"Offering Member"*  The "Offering Member" is the Member (or his or her Personal Representative) who offers or is deemed to offer to sell some or all of his or her Membership Interest to the other Members, pursuant to this Agreement.

cc.  *"Personal Representative"*  A Member's "Personal Representative" includes any administrator, executor, trustee, or other personal representative who is vested with the responsibility for administering the disposition of any Membership Interest on account of a deceased Member's death, and equally any individual who holds such Membership Interest as a legatee, distributee, or successor in interest, or trustee where no executor, administrator, or similar fiduciary is appointed or where any appointed executor, administrator, or fiduciary does not have control over any of the deceased Member's Membership Interest.

dd.  *"Persons"* shall mean any individual or Entity, and their heirs, executors, administrators, legal representatives, successors, and assigns of the "Person" when the context so permits.

ee.  *"Reserves"* shall mean, for any fiscal period, funds set aside or amounts allocated during such period to reserves that shall be maintained in amounts deemed sufficient by the Managers for working capital and to pay taxes, insurance, debt service, or other costs or expenses incident to the ownership or operation of the Company's business.

ff.  *"Selling Member"* shall mean any Member which sells, assigns, pledges, or otherwise transfers for consideration all or any portion of its Membership Interest.

gg.  *"Super Majority Vote"* shall mean the vote of Members holding more than eighty five percent (85%) of the issued and outstanding Membership Interest.

4

hh. *"Transfer," Etc* A "Transfer" is any sale, pledge, Encumbrance, gift, bequest or other transfer of any Membership interest to someone not already a Member, whether or not for value. An "Involuntary Lifetime Transfer" is any Transfer made on account of a court order or otherwise by operation of law, including any Transfer incident to any divorce or marital property settlement or any Transfer pursuant to applicable community property, quasi-community property or similar state law. A "Voluntary Lifetime Transfer" is any Transfer made during a Member's lifetime which is not an Involuntary Lifetime Transfer. Unless the context indicates otherwise, "Transfer" includes both Voluntary and Involuntary Lifetime Transfers. A Transfer made to a trust that is wholly revocable by the Transferor shall not be a Transfer for purposes of this Agreement, but any subsequent Transfer by the trustee of such trust shall be deemed to have been made by the trust's grantor.

ii. *"Transferring Member"* shall collectively mean a Selling Member and a Gifting Member.

jj. *"Treasury Regulations"* shall include proposed, temporary, and final regulations promulgated under the IRC in effect as of the date of filing the Articles of Organization and the corresponding sections of any regulations subsequently issued that amend or supersede those regulations.

## ARTICLE II:  FORMATION OF COMPANY

**2.01** *Formation.* On the 1st day of January, 2011, Rick Fletcher and Daniel P. Sloan organized a Mississippi Limited Liability Company by executing and delivering Certificate of Formation to the Mississippi Secretary of State in accordance with and pursuant to the Mississippi Act. The Company hereby forever indemnifies said organizer for such action and ratifies and confirms all activity.

**2.02** *Name.* The name of the Company is **FLETCHER EXPLORATION, LLC,** a Mississippi Limited Liability Company.

**2.03** *Principal Place of Business.* The principal place of business of the Company shall be 356 Cotton Bay Lane, Gulf Shores, Alabama 36542 and its mailing address is the same. The Company may locate its places of business and registered office at any other place or places as the Managers may from time to time deem advisable.

**2.04** *Registered Office and Registration Agent.* The Company's initial registered office shall be at the office of its registered agent at 2108 23rd Avenue, Gulfport, Mississippi 39501, and the name of its initial registered agent at such address shall be <u>Shantrell H. Nicks</u>. The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Mississippi Secretary of State pursuant to the Mississippi Act.

**2.05** *Term.* The term of the Company shall be perpetual from the subscription and acknowledgment date of the Articles of Organization, unless the Company is earlier dissolved in accordance with either the provisions of this Operating Agreement or the Mississippi Act.

## ARTICLE III:  BUSINESS OF COMPANY

**3.01** *Permitted Businesses*.  The purpose of this Company is to engage in any activity or business permitted under the laws of the United States and the State of Mississippi.

**3.02** *Non-compete and Non-conflict with the Permitted Businesses*.  The primary purpose of this Company is to engage in any activity or business permitted under the laws of the United States and the State of Mississippi involved in the oil and gas industry.

1. For three (3) years from effective ending date of this agreement, Membership will not compete with the remaining Membership or Partnership in the leasing, exploration, operation, or development of any project or AMI for oil, gas, and other minerals that the Partnership expended time or resources.  During this time, the former Membership shall not purchase or acquire in any manner, directly or indirectly, any oil gas ownership, leasehold, royalty, or other interest within the AMI except pursuant to an agreement with Partnership and/or remaining Membership.

2. The Membership recognizes the Partnership has expended significant time and effort in establishing a working relationships, intellectual property, and proprietary information.  Thus, the Membership acknowledges that Partnership shall exclusively be compensated from the financial risk taken by the Partnership.  While the Membership owns any share in the Partnership and for the next three (3) years after the Membership no longer owns any share in the Partnership; the Membership shall not directly or indirectly engage in activity that will conflict or cause a financial loss to the Partnership.

## ARTICLE IV:  MEMBERSHIP

**4.01** *Membership*.  The membership shall be, Rick Fletcher and Daniel P. Sloan.

**4.02** *Names and Addresses of Members*.  The names and addresses of the Members are as follows:

**Rick Fletcher**
18 Fieldstone Way
Sylvan Lake, Alberta , Canada , T4S-2L3

**Daniel P. Sloan**
101 Lottie Lane #5
Fairhope, AL 36532

6

## ARTICLE V:  RIGHTS AND DUTIES OF MANAGERS

**5.01** *Management*. The business and affairs of the Company shall be managed by the Managers. The Managers shall direct, manage, and control the business of the Company to the best of their ability. Except for situations in which the approval of the Members is expressly required by this Operating Agreement or by nonwaiveable provisions of applicable law, the Managers shall have full and complete authority, power, and discretion to manage and control the business, affairs, and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business. At any time when there is more than one Manager, any one Manager may take any action permitted to be taken by the Managers, unless the approval of more than one of the Managers is expressly required pursuant to this Operating Agreement or the Mississippi Act.

**5.02** *Number, Tenure, and Qualifications*. The Company shall have two (2) Managers, Rick Fletcher and Daniel P. Sloan. The number of Managers of the Company shall be fixed from time to time by the Majority Vote of the Members, but in no instance shall there be less than one Manager. Each Manager shall hold office until the next annual meeting of Members or until a successor shall have been elected and qualified. Managers shall be elected by a Super Majority Vote of the Members. Managers need not be residents of the State of Mississippi or Members of the Company.

**5.03** *Certain Powers of Managers*. Without limiting the generality of <u>Section 5.01</u> above, the Managers shall have power and authority, on behalf of the Company:

      a. To acquire property from any Person as the Managers may determine. The fact that a Manager or a Member is directly or indirectly affiliated or connected with any such Person shall not prohibit the Manager from dealing with that Person;

      b. To borrow money for the Company from banks, other lending institutions, the Managers, Members, or affiliates of the Managers or Members on such terms as the Managers deem appropriate, and in connection therewith, to hypothecate, encumber, and grant security interests in the assets of the Company to secure repayment of the borrowed sums. No debt shall be contracted or liability incurred by or on behalf of the Company except by the Managers, or to the extent permitted under the Mississippi Act, by agents or employees of the Company expressly authorized to contract such debt or incur such liability by the Managers;

      c. To purchase liability and other insurance to protect the Company's property and business;

      d. To hold and own any Company real and/or personal properties in the name of the Company;

      e. To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper, or other investments;

7

f. Upon a Unanimous Vote of the Members to sell or otherwise dispose of all or substantially all of the assets of the Company as part of a single transaction or plan so long as that disposition is not in violation of or a cause of a default under any other agreement to which the Company may be bound, provided, however, that the affirmative vote of the Members shall not be required with respect to any sale or disposition of the Company's assets in the ordinary course of the Company's business;

g. To execute on behalf of the Company all instruments and documents, including, without limitation: checks; drafts; notes and other negotiable instruments; mortgages, or deeds of trust; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; assignments; bills of sale; leases; partnership agreements; operating agreements of other limited liability companies; and any other instruments or documents necessary, in the opinion of the Managers, to the business of the Company;

h. To employ accountants, legal counsel, managing agents, or other experts to perform services for the Company and to compensate them from Company funds;

i. To enter into any and all other agreements on behalf of the Company, with any other Person for any purpose, in such forms as the Managers may approve; and

j. To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

k. Unless authorized to do so by this Operating Agreement or by a Manager or Managers of the Company, no attorney-in-fact, employee, or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose. No Member shall have any power or authority to bind the Company unless the Member has been authorized by the Managers to act as an agent of the Company in accordance with the previous sentence.

*5.04 Liability for Certain Acts.* The Managers shall perform their managerial duties in good faith, in a manner they reasonably believe to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position, would use under similar circumstances. A Manager who so performs the duties of Manager shall not have any liability by reason of being or having been a Manager of the Company. A Manager does not, in any way, guarantee the return of the Members' capital contributions or a profit for the Members from the operations of the Company. A Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct, or a wrongful taking by the Manager.

**5.05** *Managers Have No Exclusive Duty to Company.* The Managers shall not be required to manage the Company as their sole and exclusive function and they may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have any right, by virtue of this Operating Agreement, to share or participate in such other investments or activities of the Managers or to the income or proceeds derived therefrom. The Managers shall incur no liability

to the Company or to any of the Members as a result of engaging in any other business or venture.

**5.06 *Bank Accounts*.** The Managers may from time to time open bank accounts in the name of the Company, and the Managers shall be the sole signatories thereon, unless the Managers determine otherwise.

**5.07 *Indemnity of the Managers, Employees, and Other Agents*.** To the maximum extent permitted under the Mississippi Act, the Company shall indemnify the Managers and make advances for expenses. The Company shall indemnify its employees and other agents who are not Managers to the fullest extent permitted by law, provided that the indemnification in any given situation is approved by a Majority vote of the Members.

**5.08 *Resignation*.** Any Manager of the Company may resign at any time by giving written notice to the Members of the Company. The resignation of any Manager shall take effect upon receipt of that notice or at such later time as shall be specified in the notice; and, unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective. The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

**5.09 *Removal*.** At a meeting called expressly for that purpose, all or any lesser number of Managers may be removed at any time, with or without cause, by a Super Majority Vote of the Members. The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

**5.10 *Vacancies*.** Any vacancy occurring for any reason in the number of Managers of the Company may be filled by the affirmative vote of a majority of the remaining Managers then in office, provided that if there are no remaining Managers, the vacancy(ies) shall be filled by a Super Majority Vote of the Members.

a. Any Manager's position to be filled by reason of an increase in the number of Managers shall be filled by the affirmative vote of a majority of the Managers then in office or by an election at an annual meeting or at a special meeting of Members called for that purpose or by the Members' unanimous written consent.

b. A Manager elected to fill a vacancy shall be elected for the unexpired term of the Manager's predecessor in office and shall hold office until the expiration of that term and until the Manager's successor shall be elected and shall qualify or until the Manager's earlier death, resignation, or removal.

c. A Manager chosen to fill a position resulting from an increase in the number of Managers shall hold office until the next annual meeting of Members and until a successor shall be elected and shall qualify, or until the Manager's earlier death, resignation, or removal.

**5.11 *Salaries*.** The salaries and other compensation of the Managers shall be fixed from time to time by a Majority Vote of the Members, and no Manager shall be prevented from receiving that salary because the Manager is also a Member of the Company.

## ARTICLE VI:  RIGHTS AND OBLIGATIONS OF MEMBERS

**6.01** *Limitation of Liability*. Each Member's liability shall be limited as set forth in this Operating Agreement, the Mississippi Act, and other applicable law.

**6.02** *Company Debt Liability.* A Member will not be personally liable for any debts or losses of the Company beyond the Member's respective capital contributions except as otherwise provided herein or as otherwise required by law.

**6.03** *List of Members.* Upon written request of any Member, the Managers shall provide a list showing the names, addresses, and Membership Interests of all Members.

**6.04** *Approval of Sale of All Assets*. The Members shall have the right, by a Unanimous Vote of the Members, to approve the sale, exchange, or other disposition of all, or substantially all, of the Company's assets (other than in the ordinary course of the Company's business) which is to occur as part of a single transaction or plan.

**6.05** *Company Books*. The Managers shall maintain and preserve, during the term of the Company, and for five (5) years thereafter, all accounts, books, and other relevant Company documents.   Upon reasonable request, each Member shall have the right, during ordinary business hours, to inspect and copy those Company documents at the requesting Member's expense.

**6.06** *Priority and Return of Capital*. Except as may be expressly provided herein to the contrary, no Member shall have priority over any other Member, either for the return of capital contributions or for Net Profits, Net Losses, or distributions; provided that this section shall not apply to loans (as distinguished from capital contributions) which a Member has made to the Company.

**6.07** *Liability of a Member to the Company.* (a)  A Member who rightfully receives the return in whole or in part of its contribution is nevertheless liable to the Company only to the extent now or hereafter provided by the Mississippi Act.

(b)  A Member who receives a distribution made by the Company which is in violation of the Articles of Organization, this Operating Agreement, or the Mississippi Act is liable to the Company for a period of three years after the distribution for the amount of the distribution.

(c)  A Member may not receive a distribution from the Company to the extent that, after giving effect to the distribution, the Company would be insolvent.

## ARTICLE VII: MEETINGS OF MEMBERS

**7.01** *Annual Meeting*. The annual meeting of the Members shall be held on the First Tuesday in March or at such other time as shall be determined by resolution of the Members,

10

commencing with the year 2011, for the purpose of the transaction of such business as may come before the meeting.

**7.02** *Special Meetings*. Special meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, may be called by any Manager or by any Member.

**7.03** *Place of Meetings*. The Members may designate any place, either within or outside the State of Mississippi, as the place of meeting for any meeting of the Members. If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be the principal executive office of the Company in the State of Alabama.

**7.04** *Notice of Meetings*. Except as provided in Section 7.05 below, written notice stating the place, day, and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered no fewer than 10 nor more than 50 days before the date of the meeting, either personally or by mail, by or at the direction of the Managers or person calling the meeting, to each Member entitled to vote at the meeting. If mailed, the notice shall be deemed to be delivered two calendar days after being deposited in the United States mail, addressed to the Member at the Member's address as it appears on the books of the Company, with postage thereon prepaid.

**7.05** *Meeting of All Members*. If all of the Members shall meet at any time and place, either within or outside of the State of Alabama, and consent to the holding of a meeting at that time and place, the meeting shall be valid without call or notice, and at the meeting lawful action may be taken.

**7.06** *Record Date*. For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment of the meeting, or Members entitled to receive payment of any distribution, or to make a determination of Members for any other purpose, the date on which notice of the meeting is finalized or the date on which the resolution declaring the distribution is adopted, as the case may be, shall be the record date for the determination of Members. When a determination of Members entitled to vote at any meeting of Members has been as provided in this section, the determination shall apply to any adjournment of the meeting.

**7.07** *Quorum*. Members holding more than fifty percent (50%) of the issued and outstanding Membership Interest, represented in person or by proxy, shall constitute a quorum at any meeting of Members. In the absence of a quorum at any meeting of Members, a the Membership Interests so represented may adjourn the meeting from time to time for a period not to exceed 60 days without further notice. However, if the adjournment is for more than 60 days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member of record entitled to vote at the meeting. At an adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed. The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during the meeting of that number of Members whose absence would cause less than a quorum.

11

**7.08 *Manner of Acting***. If a quorum is present, a Majority Vote of the Members shall be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Mississippi Act, by the Articles of Organization, or by this Operating Agreement.

**7.09 *Voting and Proxies***. At all meetings of Members a Member may vote in person or by proxy given to any other individual or entity to exercise a Member's voting power.

**7.10 *Action by Members Without a Meeting***. Action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by each Member entitled to vote, and delivered to the Managers of the Company for inclusion in the minutes or for filing with the Company records. Action taken under this section is effective when all Members entitled to vote have signed the consent, unless the consent specifies a different effective date. The record date for determining Members entitled to take action without a meeting shall be the date the first Member signs a written consent.

**7.11 *Waiver of Notice***. When any notice is required to be given to any Member, a waiver of the notice in writing signed by the person entitled to the notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of the notice.


## ARTICLE VIII:DISTRIBUTIONS, ELECTIONS, AND REPORTS

**8.01 *Distributions.*** All distributions of cash or other property shall be made to the Members pro rata in proportion to the respective Membership Interests of the Members on the record date of the distribution. All distributions of Distributable Cash and property shall only be made upon Unanimous Vote of the Members.

**8.02 *Limitation Upon Distributions***. No distribution shall be declared and paid unless, after distribution is made, the assets of the Company are in excess of all liabilities of the Company, except liabilities to Members on account of their contributions.

**8.03 *Accounting Principles.*** It is intended that the Company will elect those accounting methods that provide the Company with the greatest tax benefits.

**8.04 *Loans to Company.*** Nothing in this Operating Agreement shall prevent any Member from making secured or unsecured loans to the Company by agreement with the Company.

**8.05 *Accounting Period.*** The Company's accounting period shall be the calendar year.

**8.06 *Records, Audits, and Reports***. At the expense of the Company, the Managers shall maintain records and accounts of all operations and expenditures of the Company. At a minimum the Company shall keep at its principal place of business the following records:

a. A current list of the full name and last known business, residence, or mailing address of each Member and Manager, both past and present;

12

b. A copy of the Articles of Organization of the Company and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

c. Copies of the Company's federal, state, and local income tax returns and reports, if any, for the four most recent years;

d. Copies of the Company's currently effective written Operating Agreement, copies of any writings permitted or required with respect to a Member's obligation to contribute cash, property, or services, and copies of any financial statements of the Company for the three most recent years;

e. Minutes of every annual meeting, special meeting, and court-ordered meeting;

f. Any written consents obtained from Members for actions taken by Members without a meeting.

**8.07 *Returns and Other Elections*.** The Managers shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the IRC and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business. Copies of those returns, or pertinent information from the returns, shall be furnished to the Members within a reasonable time after the end of the Company's fiscal year.

a. All elections permitted to be made by the Company under federal or state laws shall be made by the Managers in the their sole discretion, provided that the Managers shall make any tax election requested by Members owning more than fifty percent (50%) of the Membership Interest.

## ARTICLE IX: TRANSFERABILITY

**9.1 *Restrictions on Transfers*.** The Members do not want any Membership Units to be made generally available to persons other than the present Members. Therefore, in addition to restrictions provided under applicable state law, the Members agree that no Member will Transfer or permit to be Transferred, all or any portion of his or her Membership Interest, whether now or hereafter acquired, except in accordance with the terms of this Agreement. No attempted Transfer of any Membership Unit not in accordance with the terms of this Agreement shall be reflected on the Company's books.

**9.2 *Encumbrance*.** No Member may Encumber any or all of his or her Membership Interest in connection with any debt.

**9.3** (Reserved for future use)

**9.4 *Voluntary Lifetime Transfers*.** No Member may make any Voluntary Lifetime Transfer except pursuant to this section. Any Member who wishes to make any Voluntary Lifetime Transfer must promptly send a notice to each other Member and be deemed to have

13

offered to sell his or her Membership Interest otherwise to be Transferred to the other Members at the Agreement Price and on the Agreement Terms. Such notice shall include a statement of the type of proposed Transfer, the name, address (both home and office), and business or occupation of the person to whom such Membership Interest would be Transferred, and any other facts that are or would reasonably be deemed material to the proposed Transfer.

(a) Each other Member shall have ninety (90) days from such notice in which to elect to buy all or any of the Offered Membership Interest. The other Members may elect to buy the Offered Membership Interest in proportion to their respective Membership Interests (excluding the Offered Membership Interest), or in such other proportion as they shall agree upon.

(b) If the other Members do not agree to buy in the aggregate all of the Offered Membership Interest within such option period, such Lifetime Transfer may be completed. If a Lifetime Transfer is not consummated within ninety (90) days after the expiration of such Member option period, the provisions of this Agreement will again apply to such Offered Membership Interest as if no such Lifetime Transfer had been contemplated and no notice had been given. A Lifetime Transfer is consummated when the LLC has been given notice that legal title to the Membership Interest has been Transferred, subject to recordation on its books.

**9.5 *Involuntary Lifetime Transfers*.** Any Member who has any information that would reasonably lead him or her to expect that an Involuntary Lifetime Transfer is foreseeable must promptly send a notice to each other Member and be deemed to have offered to sell his or her Membership Interest otherwise to be Transferred to the other Members at the Agreement Price and on the Agreement Terms. Such notice shall include a statement of the type of proposed Transfer, the name, address (both home and office), and business or occupation of the person to whom such Membership Interest would be Transferred, and any other facts that are or would reasonably be deemed material to the proposed Transfer.

(a) Each other Member shall have ninety (90) days from such notice in which to elect to buy all or any of the Offered Membership Interest. The other Members may elect to buy the Offered Membership Interest in proportion to their respective Membership Interests (excluding the Offered Membership Interest), or in such other proportion as they shall agree upon.

(b) If the other Members do not agree to buy in the aggregate all of the Offered Membership Interest within such option period, such Involuntary Lifetime Transfer may be completed. If an Involuntary Lifetime Transfer is not consummated within ninety (90) days after the expiration of such Member option period, the provisions of this Agreement will again apply to such Offered Membership Interest as if no such Involuntary Lifetime Transfer had been contemplated and no notice had been given. An Involuntary Lifetime Transfer is consummated when the LLC has been given notice that legal title to the Membership Interest has been Transferred, subject to recordation on its books.

**9.6 *Transfers at Death*.** On the death of any individual Member, his or her Personal Representative will immediately be deemed to have offered to sell to the Company and to the

other Members all of the deceased Member's Membership Interest at the Agreement Price and on
the Agreement Terms.

(a)  The Company shall have sixty (60) days from the appointment of the Personal
Representative of the deceased Member's estate in which to elect to buy all or any of the
Offered Membership Interest.

(b)  Each other Member shall have forty-five (45) days from the expiration of the
option period in item (a) in which to elect to buy all or any of the Offered Membership
Interest as to which the Company did not exercise its option under item (a).  The other
Members may elect to buy such remaining shares of the Offered Membership Interest in
proportion to their respective ownership of the Membership Interest (excluding the
Offered Membership Interest), or in such other proportion as they shall agree upon.

(c)  If the Company and the other Members shall not, in the aggregate, elect to
buy all of the Offered Membership Interest within such two (2) option periods under
items (a) and (b), the Membership Interest shall be subject to devise to the deceased
Member's beneficiaries or subject to inheritance by the deceased Member's heirs.

Notwithstanding anything herein to the contrary, DANIEL P. SLOAN may bequeath
Membership Interest to his children's trust or individually to KATHERINE ANN SLOAN and
JOHN PATRICK SLOAN such that they would hold fifty percent (50%) of his issued and
outstanding Membership Interest.  This Section 9.6 shall not apply to prevent such a bequest.
DANIEL P. SLOAN's remaining Membership Interest shall be subject to the terms and
limitations of this Section 9.6.

Notwithstanding anything herein to the contrary, RICK FLETCHER may bequeath
Membership Interest to his wife, SANDY WOITAS and/or son, CHRISTOPHER FLETCHER
such that they would hold thirty percent (30%) of his issued and outstanding Membership
Interest.  This Section 9.6 shall not apply to prevent such a bequest.  RICK FLETCHER's
remaining Membership Interest shall be subject to the terms and limitations of this Section 9.6.

**9.7  *Agreement Price*.**  The Agreement Price shall be the adjusted book value of the
Offered Membership Interest on the last day of the fiscal year most recently ended prior to the
date of any deemed offer.

(a)  How Computed.  The value of the Offered Membership Interest will be determined
pursuant to this Section 10.7 by the independent certified public accountant ("CPA")
regularly employed by the Company, or, if the Company has no regularly employed
independent CPA, by an independent CPA selected by the Company for this purpose.
The value of the Offered Membership Interest shall be computed by first taking the
Weighted Average (as hereinafter defined) of the Adjusted Net Income (as hereinafter
defined) of the Company , based on the five (5) most recently ended fiscal years,
applying a Capitalization Rate Percentage (as hereinafter defined), then reducing the
resulting amount by the sum of a ten percent (10%) lack of marketability discount and a
twenty percent (20%) lack of control discount arriving at an Estimate of Value After
Discount for the Company.  The lack of control discount will only be applied to Offered
Membership Interest representing 49% or less of the total issued and outstanding

Membership Interest. This amount would then be divided by 100% to determine the Estimate of Value for a 1% and multiplied by the total percent of the Company being offered.

(i)  In determining the weighted average Adjusted Net Income of the Company over the five (5) most recently ended fiscal years, the most recently ended year shall be most heavily weighted, the next most recently ended year shall be next most heavily weighted, the third most recently ended year shall be next most heavily weighted, and so on. The weighted average Adjusted Net Income shall be equal to one fifteenth (1/15) of the following sum: (5 x the Adjusted Net Income for the most recently completed year) + (4 x the Adjusted Net Income for the next most recently completed year) + (3 x the Adjusted Net Income for the next most recently completed year) + (2 x the Adjusted Net Income for the next most recently completed year) + (1 x the Adjusted Net Income for the third most recently completed year).

(ii)  The term "Adjusted Net Income" shall be defined as the Company's total gross sales reduced by the cost of sales resulting in gross profit; further reduced by direct labor costs resulting in prime profit; subsequently reduced by general and administrative expenses including compensation and all other regularly occurring business expenses of the company arriving at net income. The Company's board of directors shall then adjust this resulting net income based upon those certain extraordinary and non-recurring expenses of the company occurring in that year arriving at Adjusted Net Income.

(iii)  The term "Capitalization Rate Percentage" shall be calculated as a "built-up rate" and determined by adding the yield at the end of the prior year of the United States twenty-year treasury bond as determined by the *Wall Street Journal;* then adding the equity risk premium for the Standard & Poor's 500 as determined by Ibbotson Associates or its successor; then adding the micro-capitalization premium as determined by the Ibbotson Associates or its successor; then adding the industry premium for Oil and Gas as determined by Ibbotson Associates or its successor; then adding a specific company risk factor as determined by management (currently 2%), the sum of which results in the net income capitalization rate to be utilized to determine the Estimate of Value by dividing the Average Weighted Net Income amount by the net income capitalization rate.

(iv)  The Adjusted Net Income shall be determined from the Company's financial statements in accordance with the regular financial statements prepared by the Company.

(v)  The Company will provide such data as the CPA deems necessary or useful to make such determination of the fair market value of the Offered Membership Interest.

(vi)  The fees and reimbursed expenses charged by the CPA in the valuation under this Section shall be borne solely by the Company.

16

**9.8** *Agreement Terms.*

(a)   The Agreement Price shall be paid by delivery of one or more promissory notes. The promissory notes will bear interest at the applicable federal rate established under Code Section 1274(d) and be payable in ninety-six equal monthly payments of principal and interest. The first payments shall be made one month from the date of closing for the sale of the Offered Membership Interest. Such note shall permit the buyer to prepay all or any part of the principal balance of the note at any time without penalty or premium.

(b)   The purchase of the Offered Membership Interest pursuant to this Agreement will take place at a closing, held at 1:00 P.M. on the thirtieth (30th) day after the date on which the last option to buy is exercised or lapses, or after the last date on which a buyer becomes obligated to buy, at the Company's primary place of business, or at any other place to which the parties agree.

(i)   At the closing, the buyer or buyers will pay for the Offered Membership Interest, and the Company will change its books to indicate that the Offered Membership Interest has been Transferred.

(ii)   If the seller does not appear at the closing, then:

(A)   The buyer or buyers shall deposit the purchase price by check or by check and note, as is appropriate under this Section, with the Escrow Agent;

(B)   The Escrow Agent shall deposit such funds with any bank with which the Company has a bank account on the date of the closing, to be paid to the seller as soon as is reasonably practicable, less an appropriate fee to the Company (not to exceed five hundred dollars ($500.00)) to pay for the additional administrative costs; and

(C)   The Company will adjust its transfer books to reflect that the Offered Membership Interest has been Transferred.

(iii)   Each Member appoints the Company as his or her agent and attorney-in-fact to execute and deliver all documents needed to convey his or her Membership Interest, if such selling Member is not present at the closing. This power of attorney is coupled with an interest, does not terminate on the Member's disability or death, and continues for as long as this Agreement is in effect.

**9.9** *Life Insurance.*   Each Member may acquire any policies of life insurance he or she deems appropriate to carry out this Agreement, and each Member will cooperate fully in any such acquisitions, including submitting to any physical examinations and providing any medical information required by the insurer.

**9.10** *Condition Precedent to Admission of Substitute Member.*   No person to whom a Membership Interest is properly transferred shall be substituted as a new Member in place of the transferring Member until:

17

(a)   The transferee has agreed in a writing delivered to each remaining Member, to assume all of the obligations and undertakings of the transferor under this Agreement;

(b)   The transferee has paid to the Members a fee not to exceed two thousand dollars ($2,000.00) to cover costs of preparing, executing and recording all pertinent documents; and

(c)   The transferee has been elected a new Member by the unanimous affirmative vote of the Members.

## ARTICLE X:   ADDITIONAL MEMBERS

**10.01** *Admission to Membership*. From the date of the formation of the Company, any Person or Entity acceptable to the Members by their unanimous vote may become a Member in this Company either by the issuance by the Company of Membership interests for such consideration as the Members by their unanimous votes shall determine, or as a transferee of a Member's Membership Interest or any portion thereof, subject to the terms and conditions of this Operating Agreement. Any person who is a transferee of an interest in the Company, but who is not accepted as a Member, shall merely be an Assignee and only entitled to the rights provided by the Alabama Act.

**10.02** *Financial Adjustments*. No new Members shall be entitled to any retroactive allocation of losses, income, or expense deductions incurred by the Company.

## ARTICLE XI:   DISSOLUTION AND TERMINATION

**11.01** *Dissolution.*

a.   The Company shall be dissolved upon the occurrence of any of three events:

i. By the unanimous written agreement of all Members; or

ii. Upon the death, retirement, resignation, expulsion, bankruptcy, or dissolution of a Member or occurrence of any other event which terminates the continued membership of a Member in the Company (a "Withdrawal Event"), unless the business of the Company is continued by the consent of remaining Members holding more than fifty percent (50%) of the Membership Interest (without including the Member over which the dissolution was triggered) within 90 days after the Withdrawal Event.

b.   Notwithstanding anything to the contrary in this Operating Agreement, if a Member or Members owning Membership Interests which in the aggregate constitute not less than 85 percent of the Membership Interests vote to dissolve the Company at a meeting of the Company pursuant to Article VII, then all of the Members shall agree in writing to dissolve the Company as soon as possible (but in any event not more than 10 days) thereafter.

18

c.     As soon as possible following the occurrence of any of the events specified in this <u>Section 11.01</u> effecting the dissolution of the Company, the appropriate representative of the Company shall execute a statement of intent to dissolve in such form as shall be prescribed by the Mississippi Secretary of State and file same with the Mississippi Secretary of State's office.

d.     If a Member who is an individual dies or a court of competent jurisdiction adjudges him to be incompetent to manage the Member's person or property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling the Member's estate or administering his property.

e.     Except as expressly permitted in this Operating Agreement, a Member shall not voluntarily resign or take any other voluntary action that directly causes a Withdrawal Event. Unless otherwise approved by a Majority Vote of the Members, a Member who resigns (a "Resigning Member") or whose Membership Interest is otherwise terminated by virtue of a Withdrawal Event, regardless of whether the Withdrawal Event was the result of a voluntary act by the Member, shall not be entitled to receive any distributions to which the Member would not have been entitled had the Member remained a Member.  Damages for breach of this Section 11.01(e) shall be monetary damages only (and not specific performance), and the damages may be offset against distributions by the Company to which the Resigning Member would otherwise be entitled.

**11.02** ***Effect of Filing of Dissolving Statement.*** Upon the filing with the Mississippi Secretary of State of a statement of intent to dissolve, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business, but its separate existence shall continue until a certificate of dissolution has been issued by the Secretary of State or until a decree dissolving the Company has been entered by a court of competent jurisdiction.

**11.03** ***Winding Up, Liquidation, and Distribution of Assets.*** Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities, and operations, from the date of the last previous accounting until the date of dissolution. The Managers shall immediately proceed to wind up the affairs of the Company. If the Company is dissolved and its affairs are to be wound up, the Managers shall comply with the Mississippi Act.

**11.04** ***Articles of Dissolution.*** When all debts, liabilities, and obligations have been paid and discharged or adequate provisions have been made therefore and all of the remaining property and assets have been distributed to the Members, articles of dissolution shall be executed in duplicate and verified by the person signing the articles, which articles shall set forth the information required by the Mississippi Act. Duplicate originals of the articles of dissolution shall be delivered to the Mississippi Secretary of State.

**11.05** ***Certificate of Dissolution.*** Upon the issuance of the certificate of dissolution, the existence of the Company shall cease, except for the purpose of suits, other proceedings, and appropriate action as provided in the Mississippi Act. The Managers shall have authority to distribute any Company property discovered after dissolution, convey real estate, and take such other action as may be necessary on behalf of and in the name of the Company.

**12.09** *Waivers*. The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act that would have originally constituted a violation, from having the effect of an original violation.

**12.10** *Rights and Remedies Cumulative.* The rights and remedies provided by this Operating Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies. Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance, or otherwise.

**12.11** *Severability*. If any provision of this Operating Agreement or its application to any person or circumstance shall be invalid, illegal, or unenforceable to any extent, the remainder of this Operating Agreement and its application shall not be affected and shall be enforceable to the fullest extent permitted by law.

**12.12** *Heirs, Successors, and Assigns*. Each and all of the covenants, terms, provisions, and agreements contained in this Operating Agreement shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors, and assigns.

**12.13** *Creditors.* None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company.

**12.14** *Counterparts*. This Operating Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

**12.15** *Rule Against Perpetuities*. The parties to this Operating Agreement intend that the Rule against Perpetuities (and any similar rule of law) not apply to any provisions of this Operating Agreement. However, notwithstanding anything to the contrary in this Operating Agreement, if any provision in this Operating Agreement would be invalid or unenforceable because of the Rule against Perpetuities or any similar rule of law but for this Section 12.15, the parties to this Operating Agreement hereby agree that any future interest which is created pursuant to said provision shall cease if it is not vested within 21 years after the death of the survivor of the group composed of (all who are currently Members) and their issue who are living on the date of this Operating Agreement and their issue, if any, who are living on the effective date of this Operating Agreement.

**12.16** *Investment Representations.* The parties to this Operating Agreement agree as follows with respect to investment representation.

      a.    The undersigned Members understand:

      i. That the Membership Interests evidenced by this Operating Agreement have not been registered under the Securities Act of 1933, 15 U.S.C. Section 15b et seq., the Florida Securities Act or any other state securities laws (the "Securities Acts") because the Company is issuing these Membership Interests in reliance upon the exemptions from the

## CERTIFICATE

The undersigned hereby agrees, acknowledges, and certifies that the foregoing Operating Agreement for **FLETHCHER EXPLORATION, LLC** consisting of __22__ pages, excluding attached Exhibits, constitutes the Operating Agreement of the Limited Liability Company adopted by the Members of this Company as of January 1, 2011.

Rick Fletcher

Daniel P. Sloan

## ACKNOWLEDGEMENT

**STATE OF ALABAMA**

**COUNTY OF BALDWIN**

I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that Rick Fletcher, whose name as a Member of Fletcher Exploration, LLC, a Mississippi Limited Liability Company, is signed to the foregoing Operating Agreement and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such member and with full authority, executed the same voluntarily for and as the act of said Company.

Witness my hand and seal of office on this the __18__ day of __October__ 2011.

NOTARY PUBLIC

My Commission Expires: __7-6-2015__

23

**STATE OF ALABAMA**

**COUNTY OF BALDWIN**

I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that Daniel P. Sloan, whose name as a Member of Fletcher Exploration, LLC, a Mississippi Limited Liability Company, is signed to the foregoing Operating Agreement and who is known to me, acknowledged before me on this day that, being informed of the contents of the instrument, he, as such member and with full authority, executed the same voluntarily for and as the act of said Company.

Witness my hand and seal of office on this the ___18___ day of ___October___ 2011.

_Christen Burkett_
NOTARY PUBLIC

My Commission Expires: ___7-6-2015___

24

## EXHIBIT "A"

| Member | Membership Units |
|---|---|
| Rick Fletcher | 750 |
| Daniel P. Sloan | 250 |
|  |  |
|  |  |

25